## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## STATESBORO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **CASE NO: 6:22-CR-006** |
| | ) | |
| LUCKY S. OTT, JR. | ) | |

### DEFENDANT'S MOTION IN LIMINE
### REGARDING THE ANTI-KICKBACK STATUTE

The government's case here is based on legal theories that courts have rejected in other cases. Just this year, the Seventh Circuit Court of Appeals overturned the conviction of one business owner for alleged violations of the Anti-Kickback Statute, and a district court in Michigan overturned a conviction on Rule 29 of another business owner for similar violations.[1] The government even agreed to vacate the conviction of a marketer who (1) pled guilty to violations of the AKS and (2) testified against another person, and the government has acknowledged that this marketer (who served time in federal prison) is actually and factually innocent.[2]

Given all this, it is important to be very clear what this case involves and does not involve, and it is important for the jury to have as clear an understanding of the law as possible. Defendant Lucky Ott, through undersigned counsel, requests that this Court exclude witnesses from offering current opinions about the law, including statements about whether they now or recently believe that they violated the Anti-Kickback Statute, and for other relief to avoid confusion and undue prejudice.[3]

---

[1]     *United States v. Sorensen*, 134 F.4th 493 (7th Cir. 2025), *United States v. Khalil*, 2025 WL 1921758 (E.D. Mich. July 11, 2025).

[2]     *See O'Neil v. United States*, 25 CV 10065 (N.D. Illinois), Docket #1 (filed on August 22, 2025).

[3]     Counsel provided a draft of this motion to the government on September 16, 2025. The government responded that it opposed this motion.

I.    **Factual Background Relating to This Case**

In or around 2015, Lucky Ott started a pharmacy in Boerne, Texas with his girlfriend at the time, who was a licensed pharmacist and was an owner of the pharmacy.

In or around April 2016, Ott met Chris O'Hara through a mutual acquaintance. O'Hara offered to work with Boerne Drug Pharmacy via his companies in two roles. O'Hara wanted Boerne Drug to use and offer telemedicine technology from his company, 1stCare MD. He also offered to manage marketing services via another company. Initially, O'Hara sent Ott a contract on behalf of American Rx Medical Consultants and that called for this company to be paid 55 percent of net profit.[4] Later, O'Hara allegedly managed marketing services via a different company, ProfitsCentric.

At the time Ott met O'Hara, Boerne Drug Pharmacy was represented by Frank Messina, a lawyer in Texas. Ott introduced O'Hara to Messina, and O'Hara also retained Messina as counsel. During the alleged conspiracy period, Messina at times represented Boerne Drug Pharmacy as well as 1stCare MD.

In July 2016, O'Hara asked Messina for advice on how to set up the relationship between O'Hara's marketing company and Boerne Drug Pharmacy. O'Hara wrote, "A pharmacy [Boerne] wants a compliant method of hiring a master marketing organization who will recruit and manage marketers throughout the pharmacy's operating area – what is the best method to accomplish that." Messina responded that the "main concern with these arrangements" was the Anti-Kickback

---

[4]    The government may believe that this proposed contract was in violation of the Anti-Kickback Statute because compensation was percentage-based, and the government has taken that position with similar contracts in other cases around the country. But, as two circuit courts have held, percentage-based compensation for marketing does *not* actually violate the Anti-Kickback Statute. *See United States v. Sorensen,* 134 F.4th 493, 502 (7th Cir. 2025) ( The fact that SyMed shared revenue with PakMed on a percentage basis does not render the arrangement illegal. "[P]ercentage-based compensation structures are not per se unlawful."'), quoting *United States v. Marchetti,* 96 F.4th 818, 831 (5th Cir. 2024).

Statute and recommended drafting an agreement "in accordance with a safe harbor to the AKS statute and in compliance with the law."  This email was forwarded to Ott.

Boerne Drug Pharmacy made multiple payments to O'Hara's company ProfitsCentric and Advanced Payment Solutions during the alleged conspiracy period.  During this time, there was no written contract between Boerne Drug Pharmacy and ProfitsCentric.  Multiple times from July 2016 through early 2019, Messina recommended that O'Hara and Ott finalize and sign written agreements, but no such agreements were ever finalized or signed.[5]

Ott and O'Hara developed a close relationship and spent a lot of time together.  They also discussed multiple business ventures, including buying a pharmacy together.  At times, O'Hara indicated that he viewed himself as having an ownership or managerial role in Boerne Drug Pharmacy.

As Ott himself will testify at trial, he believed that O'Hara oversaw various marketers, including a company operated by Christopher Cirri and Nicholas Defonte.  Ott did not know much about what the marketers did, but he believed that they did do marketing and that there was no cold-calling of patients involved.  Ott also did not know much about what the 1stCare MD doctors did, but he believed, based on representations by O'Hara, that the patients had a relationship with the doctors because the patients had signed up for telemedicine services with 1stCare MD or a predecessor company.  Ott also believed that the doctors actually consulted with the patients before ordering medications that were provided by Boerne Drug.

As the evidence will show at trial, unbeknownst to Ott, the marketers who were connected to O'Hara worked very differently from what Ott had believed.  In fact, marketers such as Cirri

---

[5]    Ott acknowledges that the failure to sign the proposed written agreements means that the arrangement was not covered by a safe-harbor to the Anti-Kickback Statute, but that does *not* mean that the underlying agreement violated the Anti-Kickback Statute.

and DeFonte did not do marketing such as TV ads or online marketing. Cirri and DeFonte bought leads from other sources who apparently engaged in cold-calling Medicare patients in what may have been harassing and disturbing ways. They then paid O'Hara's company 1stCare MD to have doctors who had never interacted with the patients before, including Dr. Karen Butler, to sign written orders. The doctors who worked for 1stCare MD were supposed to have telephone consultations with the patients before signing the orders, but not all doctors had such calls. The orders that were provided to companies such as Boerne Drug Pharmacy were invalid in many ways, but Ott did not know that at the time.

## II.    Background on Alleged Co-Conspirators O'Hara, Cirri, Defonte, and Butler

The government has indicated that they view O'Hara, Cirri, Defonte, and Butler as members of the conspiracy charged in this case.[6] But the roles and relationships of O'Hara, Cirri, Defonte, and Butler are complicated and go well beyond the relationship with O'Hara. Significantly, *none* of the plea agreements entered by O'Hara, Cirri, Defonte, and Butler specifically refer to arrangements with Lucky Orr, Boerne Drug, or the conspiracy charged in this case, and the charges against O'Hara and Butler have nothing to do with the payments at issue in this case.

### A.    O'Hara

O'Hara pled guilty in 2024 in the Western District of Texas to a conspiracy to violate the Anti-Kickback Statute that began in or around June 2015 and that continued through in or around April 2019. According to the factual basis in the plea, this conspiracy does not involve Boerne Drug Pharmacy and does not involve payments by Boerne Drug Pharmacy or other pharmacies to

---

[6]    Ott previously filed a motion in limine to limit the evidence at trial to the indictment, which specifies only payments to doctors like Dr. Butler (Docket #88). This motion is pending.

ProfitsCentric.  Instead, the conspiracy in the plea focuses on payments by marketing companies like Cirri's to 1stCare MD.

In the plea, O'Hara admits that marketers paid O'Hara via ProfitsCentric and 1stCare MD "in exchange for signed doctors' orders for items and services."  O'Hara admits that he used "sham invoices" with the marketers to "conceal" the use of "illegal kickbacks and bribes."  All this relates to payments from marketers to O'Hara, *not* from pharmacies like Boerne Drug to O'Hara.

O'Hara also admits in the plea that he knew that the doctors and nurse practitioners "did not have a pre-existing doctor-patient relationship and did not conduct a physical examination on the Medicare beneficiaries."

The diagram below shows O'Hara's involvement with 1stCareMD and ProfitsCentric and the various payments involved.  As noted above, O'Hara's guilty plea involves payments b*y the marketers* to his companies, whereas the charges in this case involve payments *by Boerne Drug Pharmacy*.



## B.    Cirri and Defonte

As for Cirri and Defonte, each pled guilty in 2019 to one-count informations in the District of New Jersey.  Each pled to a conspiracy to commit health care fraud from in or around March 2018 through in or around April 2019.  According to the informations, Defonte and Cirri ued call centers "under their direction" and at least two telemedicine companies to obtain orders for prescriptions.  According to the informations, Defonte and Cirri paid kickbacks to the telemedicine

companies and were received kickbacks from the companies that received the orders that Defonte and Cirri provided. The informations do not specifically reference 1stCare MD or Boerne Drug, but indicate that those companies were among the companies that Cirri and Defonte worked with.

### C.    Dr. Karen Butler

Dr. Karen Butler was a doctor in Georgia who worked for 1stCare MD and is the only unnamed co-conspirator referenced in the indictment in this case. In 2019, she pled guilty to a one-count information charging her with a conspiracy that involved the making of false statements in connection with the delivery of health care items in violation of Title 18, United States Code, Section 1035.

According to the factual basis in the plea, Dr. Butler's crime involved her signing false medical records. According to the plea, she "signed false medical records describing 'consultations' of Medicare patients, … certified she performed examinations never actually conducted, and certified tests never actually performed." According to the plea, she "knowingly and willfully signed these false medical records," "knowing them to contain materially false, fictitious, or fraudulent statements."

*Nothing* in Butler's plea refers to a violation of the Anti-Kickback Statute. Nothing in Butler's plea refers to Boerne Drug Pharmacy or Lucky Ott.

### III.    Alleged Co-Conspirators' Current Legal Opinions Should Be Precluded

This case involves a complicated, technical statute that the government itself has mis-interpreted over time. The Anti-Kickback Statute criminalizes conduct that is perfectly legal in other contexts, it includes vague terms that have been the subject of litigation, and it has safe-harbor regulations that exempt conduct that might otherwise be covered by the statute.

Given all this, under Federal Rule of Evidence 403, government witnesses should not be allowed to testify about their *current* opinions about the Anti-Kickback Statute, including whether

a particular payment is a "kickback" or was illegal.  *See, e.g., United States v. Arlt*, 567 F.2d 1295 (5th Cir. 1978) (witness cannot give a legal opinion which they are not qualified to answer), *Ma v. Equifax Information Services*, LLC, 288 F.Supp.3d 1360, 1367 (N.D. Georgia 2017) (witnesses are prohibited from testifying as to questions of law).  For example, O'Hara said in his 2024 plea agreement that he "agrees and admits" that his payment arrangement with marketers "was an illegal kickback arrangement in violation of Title 42 U.S.C. § 1320a-7b."  What he believes *now* is irrelevant.  He presumably has had multiple meetings with his counsel in the criminal case, and he presumably has had multiple meetings with the government as well, and those meetings inform his current belief.

Accordingly, no witness should be allowed to testify about their *current* understanding of the Anti-Kickback Statute.

**IV.    O'Hara Should Be Precluded from Testifying that He Violated the Anti-Kickback Statute**

Along the same lines, O'Hara should be precluded under Federal Rule of Evidence 403 from testifying that he pled guilty to conspiring to violate the Anti-Kickback Statute or that he violated the Anti-Kickback Statute.  Such testimony would be improper because it (a) incorporates O'Hara's current opinion about the Anti-Kickback Statute, and (b) would be confusing because he pled guilty to a different conspiracy than the one charged in this case.

This approach is supported by cases such as *United States v. Harrell*, 436 F.2d 606, 614-15 (5th Cir. 1970).  There, the Fifth Circuit reversed a conviction in which a witness testified, over the defendant's objection, that he had pled guilty to the same conspiracy charge that the defendant on trial was contesting.  In particular, the Fifth Circuit noted that the witness's guilty plea was "no more and no less than an inadmissible hearsay statement – made long after the conspiracy had ended – that he and Harrell had indeed conspired together as the indictment charged."  436 F.2d at

614-15.  Moreover, the Fifth Circuit cast significant doubt on whether there was any valid evidentiary purpose in eliciting such hearsay.  "[W]e think that the evidentiary purpose ordinarily to be served by proof of a co-defendant's plea of guilty is so shadowy, so insubstantial that it would be the better practice in run-of-the-mill cases to exclude such proof altogether."  Id. at 617.

In *United States v. King*, 505 F.2d 602 (5th Cir. 1974), the Fifth Circuit recognized that the introduction of a witness's plea should only occur when there is a legitimate evidentiary purpose:

> We recognize that there is potential prejudice inherent in a witness' statement that he was the defendant accomplice or co-conspirator, and that he has pled guilty to the crime for which the defendant is charged. One person's guilty plea or conviction may not be used as substantive evidence of the guilt of another. The introduction of a codefendant's guilty plea is permissible, however, when its use is limited to proper evidentiary purposes such as to impeach trial testimony or to reflect on a witness' credibility.

*Id*. at 607.

The Fifth Circuit found in *King* and other cases that there was an evidentiary purpose to eliciting a witness's plea when the defendant attacks the witness as a bad person who is lying to help the government.  In *King*, the Fifth Circuit found that the defendant's counsel had made references to the witness's criminal record which "injected" the witness's record into the case, making it "almost essential for the prosecution to bring out [the witness's] convictions on direct examination."  505 F.2d at 608-09.  In *United States v. Medina-Arellano*, 569 F.2d 349, 356-57 (5th Cir. 1978), the Fifth Circuit found that the defense had "followed the usual pattern for this kind of case" and portrayed the witness as a "bad person" who had "invented lies," thus allowing the government to bring out the witness's record to "preempt a defense attack on [the witness's] credibility."

This case, however, is not a typical case.

8

First, while O'Hara may have believed in April 2024 that he had violated the Anti-Kickback Statute, it is not clear that he *actually* violated the law.  The factual basis in O'Hara's plea agreement probably would not be sufficient as a matter of law at this time, as it largely assumes that O'Hara's agreement with marketers was illegal without getting into the factual circumstances that are now clearly required under *Sorensen* and similar cases.  There is no mention of healthcare decisions as required under *Sorensen*, and there is no mention of improperly influencing healthcare decisions.  Notably, as referenced above, a marketer who pled guilty to violating the Anti-Kickback Statute recently filed a 2255 petition in the Northern District of Illinois to vacate his conviction on the ground that he was actually innocent, and the government agreed.

Second, as noted above, O'Hara pled guilty to a different conspiracy than the one that is charged in this case, so it would prejudice Lucky Ott if the jury hears that O'Hara pled guilty to a conspiracy to violate the Anti-Kickback Statute unless the jury fully understands that O'Hara pled guilty to a different conspiracy that did not involve Lucky Ott.

Given all this, Ott states affirmatively that he will not seek to attack O'Hara's credibility on the basis that O'Hara pled guilty specifically to conspiracy to violate the Anti-Kickback Statute. "When the defendant agrees [in a motion in limine] not to question the government's witness about the guilty plea or plea agreement or to use the plea to impeach the witness's credibility, then the government is left with no legitimate purpose in using the guilty plea during direct examination." *United States v. Kroh*, 915 F.2d 326, 337-38 (8th Cir. 1990) (dissenting opinion).[7]

---

[7]    The *Kroh* case involved a government witness who testified on direct examination that he had pled guilty to three counts of bank fraud, including a conspiracy count.  The majority found that this was admissible but noted that this was because the evidence was limited to the fact of the plea, without details as to the plea.  "The government focused only on the fact of the guilty plea and the quid pro quo involved in George's agreement with the government.  The prosecutor did not even mention that the conspiracy to which George Kroh pled guilty was a conspiracy with John Kroh…"  915 F.2d at 331.

At the same time, Ott does not object to O'Hara saying on direct examination that he had pled guilty to an unspecified felony in connection with the case and that he was testifying in order to receive consideration at sentencing. This would sufficiently address a legitimate evidentiary purpose without causing undue prejudice. This would also be consistent with Pattern Criminal Jury Instruction S1.2, which refers to the fact that a government witness has a plea agreement with the government without specifying the charge. And this would be in keeping with Ott's position that O'Hara definitely did commit some crimes, such as health care fraud and wire fraud, even if the government has chosen to not prosecute O'Hara in those regards.

## V.  Alleged co-conspirators should be allowed to testify about their past understanding of the Anti-Kickback Statute and the bases for such understanding

While alleged co-conspirators' *current* understandings of the Anti-Kickback Statute are irrelevant and should be precluded, what each believed and understood about the Anti-Kickback Statute *during the time period covered in the indictment* (June 2017 through April 2019) is highly relevant as factual evidence and should be admitted. To conspire to violate the Anti-Kickback Statute, one must act *willfully*, meaning one must know at the time that your conduct violated the Anti-Kickback Statute or is at least illegal. Accordingly, if someone did not understand that their conduct violated the Anti-Kickback Statute, then they did not act willfully and did not conspire.

For example, if Ott and O'Hara did not believe that their conduct violated the Anti-Kickback Statute in June 2017, then they could not have conspired to violate the Anti-Kickback Statute at that time, and Ott could only be guilty of conspiring with O'Hara to violate the Anti-Kickback Statute if both came to believe at some point by or in April 2019 that their conduct violated the Anti-Kickback Statute.

Similarly, if Cirri, Defonte, and Butler did not understand at specific times that their conduct violated the Anti-Kickback Statute, then this undercuts the conspiracy alleged against Ott.

10

Notably, the pleas for Cirri and Defonte cover time periods beginning in March 2018, long after they began working with O'Hara and with Ott, and the discovery provided by the government indicates that Cirri and Defonte will say that they initially did not know that there was anything wrong about the work they were doing and then at some *later* point came to believe that some aspects of their work were wrong and continued such work.

The plea for Butler makes no mention of the Anti-Kickback Statute, and nothing in the discovery provided by the government so far indicates that she *ever* believed during the alleged conspiracy period that her payment arrangement with 1stCare MD was illegal.  If she did not believe that her payment arrangement with 1stCareMD was illegal, this significantly undercuts the conspiracy set forth in the indictment against Ott.

This is especially important because O'Hara had interactions with lawyers and the government during the alleged conspiracy period that Ott was not aware of.

In August 2018, O'Hara was deposed in a qui tam case that had been brought against multiple defendants, including 1stCare MD, in the Middle District of Florida.  At the deposition, O'Hara was represented by the lawyer who represents him in the criminal case in the Western District of Texas.  When asked multiple questions about payments to 1stCare MD, O'Hara invoked his Fifth Amendment right against self-incrimination.  *See* Exhibit 2 (excerpts of O'Hara's deposition).  Accordingly, O'Hara obviously knew in August 2018 that the way 1stCareMD operated might violate or did violate the Anti-Kickback Statute.

Ott should be allowed to ask O'Hara about his understanding of the Anti-Kickback Statute as of August 2018 and how he came to this understanding.  If he invokes privilege to avoid answering such questions, this will raise potentially difficult issues for the Court, such as whether such invocations constitute a violation of Ott's Confrontation Clause rights and/or warrant a

missing witness instruction.  If he invokes privilege, Ott should also be allowed to ask O'Hara about discussions that he or his lawyer has had with the government about his cooperation agreement and whether the government will still him consider him to be fully cooperating if he asserts his privilege to avoid answering questions in this case.

Similarly, in November 2018, 1stCare MD provided a response to a civil investigative demand that had been issued by the U.S. Attorney's Office for the District of Nevada.  Some of the answers in that response appear to be misleading if not false, and Ott should be allowed to ask O'Hara about this response, which was submitted by Frank Messina, who was acting as counsel for 1stCare MD.  Notably, the lawyer who represented O'Hara at the August 2018 deposition and in his current criminal case was also involved in communications with the U.S. Attorney's Office for the District of Nevada.  Ott should be allowed to ask O'Hara about his knowledge of and involvement in this response, including whether he lied to his lawyers at the time.

Overall, witnesses should be precluded from offering current opinions about the Anti-Kickback Statute but should be allowed to provide fact testimony about their understanding of the Anti-Kickback Statute at specific times during alleged conspiracy period as well as how they came to such understandings.

## VI.    **Witnesses should be precluded from giving opinions about Lucky Ott's knowledge**

While witnesses can describe specific conversations and interactions that they had with Lucky Ott and can testify about their personal knowledge, their opinions about his knowledge should be barred as improper lay opinions under Rule 701 and as not relevant under Rule 403.

The Second Circuit discussed this issue in *United States v. Rea*, 958 F.2d 1206, 1216 (2d Cir. 1992):

> When the issue is a party's knowledge, which is perhaps a more easily fathomed state of mind than, for example, intent or motivation, we suspect that in most instances a proffered lay opinion

will not meet the requirements of Rule 701. There are a number of objective factual bases from which it is possible to infer with some confidence that a person knows a given fact. These include what the person was told directly, what he was in a position to see or hear, what statements he himself made to others, conduct in which he engaged, and what his background and experience were. When a witness has not identified the objective bases for his opinion, the proffered opinion obviously fails completely to meet the requirements of Rule 701, first because there is no way for the court to assess whether it is rationally based on the witness's perceptions, and second because the opinion does not help the jury but only tells it in conclusory fashion what it should find. *See, e.g., United States v. Whitworth*, 856 F.2d 1268, 1284–85 (9th Cir.1988) (opinion that defendant had requisite knowledge based simply on "[c]ommon sense" did not meet Rule 701 requirements), cert. denied, 489 U.S. 1084, 109 S.Ct. 1541, 103 L.Ed.2d 846 (1989); *see also United States v. Phillips*, 600 F.2d 535, 538–39 (5th Cir.1979) (opinion, with no testimony as to objective bases, that defendant "indicate[d]" he "understood" held arguably inadmissible and, in any event, wholly insufficient to establish knowledge). On the other hand, when a witness has fully described what a defendant was in a position to observe, what the defendant was told, and what the defendant said or did, the witness's opinion as to the defendant's knowledge will often not be "helpful" within the meaning of Rule 701 because the jury will be in as good a position as the witness to draw the inference as to whether or not the defendant knew.

*Id*. at 1216.

Other courts have applied similar reasoning. In *United States v. Hauert*, 40 F.3d 197, 201 (7th Cir. 1994), the Seventh Circuit stated that "we agree with the opinion [in *Rea*] that opinion testimony on a party's knowledge of the law 'in most instances … will not meet the requirements of Rule 701" and that there was no abuse of discretion in precluding lay opinions about knowledge of other topics. *See also United States v. Noel*, 581 F.3d 490, 496 (7th Cir. 2009) ("a lay witness's purpose is to inform the jury what is in the evidence, not to tell it what inferences to draw from that evidence. Once the evidence is presented, the jury is capable of examining it and determining whether it supports a conviction; it does not need lay testimony to assist in making that determination"). Similarly, in *United States v. Polishan*, 336 F.3d 234, 242 (3d Cir. 2003), the

Third Circuit noted that while it had never held that "lay opinion evidence concerning the knowledge of a third party is *per se* inadmissible, we have certainly made this kind of evidence difficult to admit."

Accordingly, the Court should bar the government from asking witnesses to testify about their opinions or "impressions" of Lucky Ott's knowledge.

Similarly, witnesses should be precluded from testifying about what "most" or "many" people in the industry may have believed. Even if they were qualified to offer such opinions, such opinions would be not relevant here. Justice Gorsuch addressed this in a dissent in *Diaz v. United States*, 602 U.S. 526 (2024), explaining that expert opinions about what "most" drug couriers think should not have been allowed under Rule 403—even if they were permissible under Rule 704(b):

> Surely, in our system of justice – where we recognize that each individual is presumed innocent and distinctly endowed with free will and choice, where the individual is responsible for his culpable mental states but not those of others – testimony about what 'most' people think bears minimal value when the question at issue is what *this* individual thinks.

602 U.S. at 553 (emphasis in original).

So too here. What other people may have believed about similar arrangements is irrelevant to what Lucky Ott believed, and such testimony should not be allowed.

## VII.    Motion for instructions about the Anti-Kickback Statute at the beginning of trial

Given the complexities of this case, including misunderstandings of the Anti-Kickback Statute, Ott asks the Court to provide instructions to the jury at the beginning of the trial about what the Anti-Kickback Statute does and does not prohibit. The following proposed instructions are based on *United States v. Sorensen*, 134 F.4th 493 (7th Cir. 2025) and *United States v. Marchetti,* 96 F.4th 818 (5th Cir. 2024).

- It is illegal under the Anti-Kickback Statute to pay doctors, patients or others who make medical decisions to improperly influence their medical decision-making.
- It is not illegal per se to pay doctors to review charts on a per-chart basis. It is only illegal under the Anti-Kickback Statute if one purpose of such payments is to improperly influence doctors' medical decisions.
- It is not illegal per se to pay someone to engage in marketing, and it is not illegal per se to pay someone to engage in marketing or to engage in activities that do not involve medical decisions. It is only illegal under the Anti-Kickback Statute if one purpose of such payments is to improperly influence medical decisions.
- It is not illegal per se to pay someone on a percentage basis. It is only illegal under the Anti-Kickback Statute if the intent of such payments is to improperly influence medical decisions by the person who is being paid or who benefits from such payments.
- It is not illegal to make payments to someone for activities that the payor believes will not improperly influence medical decisions, even if it turns out that the payments do improperly influence medical decisions.
- It is not illegal per se to use invoices that are inconsistent with payment arrangements, but if someone (1) has made payment arrangements that are illegal and (2) knowingly creates or uses invoices to conceal the fact that the person is using payment arrangements are illegal, that fact could be considered evidence of willfulness on behalf of that person.
- There are many payment arrangements that might appear to violate the Anti-Kickback Statute but do not actually violate the Anti-Kickback Statute. The Department of Health and Human Services has issued multiple "safe harbor" regulations that describe various payment and business practices that might potentially be illegal under the Anti-Kickback Statute but are not treated as offenses. If a payment arrangement does not squarely satisfy all the conditions set forth in the safe harbor regulations, it is not automatically exempt from the Anti-Kickback Statute, but the arrangement is not automatically illegal and may still be legal.
- A violation of the Anti-Kickback Statute is a crime only if a person violated the Anti-Kickback Statute "willfully" under the law. To be clear, a negligent or reckless violation of the Anti-Kickback Statute is not a crime.

Without such instructions, the jury will be unduly confused about what the Anti-Kickback Statute prohibits and does not prohibit, particularly if witnesses testify about understandings which have subsequently been shown to be wrong as a matter of law. Without such instructions, jurors might wonder if Google violates the Anti-Kickback Statute whenever it is paid to run an online ad, or if a doctor violates the Anti-Kickback Statute by paying an office manager whose duties include

processing or sending out medical orders.  The Anti-Kickback Statute does not reach so far, and the jury should be given instructions to make that clear.

If such instructions are not given, Ott, in the alternative, requests that the government be precluded from making arguments that misstate the law.  In particular, the government should be precluded from saying that "paying for orders" is illegal.  The government has used this phrase in other cases, and this phrase is legally incorrect and will lead to confusion.

## CONCLUSION

For the reasons discussed above, Ott asks the Court to grant the relief requested herein.

Respectfully submitted this 21st day of September, 2025.

/s/ Stephen Chahn Lee
Stephen Chahn Lee
Admitted *pro hac vice*
Attorney for Defendant
Law Office of Stephen Chahn Lee, LLC
209 S. LaSalle St, Suite 950
Chicago, IL 60604
312-436-1790
slee@stephenleelaw.com
